# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

|  |  |  |
|---|---|---|
| **KENNETH D. BELL, in his capacity as court-appointed Receiver for Rex Venture Group, LLC d/b/a ZeekRewards.com,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Civil Action No. 3:15-cv-199** |
| **ERIC MORTENSEN, JOERGEN STEGLER LORENTZEN, and LEDA RASMUSSEN,** | ) ) ) | |
| **Defendants.** | ) ) ) | |

## COMPLAINT

Kenneth D. Bell (the "Receiver"), as Receiver for Rex Venture Group, LLC

("RVG") d/b/a www.ZeekRewards.com ("ZeekRewards" or "Zeek"), alleges as follows:

## SUMMARY OF CLAIMS

1.      RVG operated a massive Ponzi and pyramid scheme through ZeekRewards

from at least January 2011 until August 2012 in which over 700,000 participants lost over

$700 million dollars.  This lawsuit is one of several steps the Receiver is taking to

recapture the money paid to the scheme's winners so that it can be returned to RVG's

victims.

2.      As part of the scheme, RVG promised substantial payouts or outsized

returns to all participants, but few actually benefitted.  The largest "net winners" (those

who received more money from Zeek than they paid in to Zeek) each received well over a million dollars, and many others received hundreds of thousands of dollars. Each of the net winners sued by name in this action won in excess of $50,000 (either individually or together with another family member or through shell corporations).

3. Like all classic Ponzi and pyramid schemes, the vast majority of the Zeek winners' money came from the Zeek losers rather than legitimate business profits. At least $845 million was paid in to Zeek. No more than $6.3 million (less than 1%) came from retail bid purchases by non-participants. In total, the Zeek database records show that over 92% of the money paid in to Zeek came from net losers, and Zeek's net winners received over $283 million in net winnings.

4. Because Zeek's net winners "won" (the victims') money in an unlawful combined Ponzi and pyramid scheme, the net winners are not permitted to keep their winnings and must return the fraudulently transferred winnings back to the Receiver for distribution to Zeek's victims.

## THE PARTIES

### The Receiver

5. Kenneth D. Bell is the Receiver appointed by this Court in *Securities and Exchange Commission v. Rex Venture Group, LLC d/b/a ZeekRewards.com and Paul Burks*, Civil Action No. 3:12 cv 519 (the "SEC Action") for and over the assets, rights, and all other interests of the estate of Rex Venture Group, LLC, d/b/a ZeekRewards.com and its subsidiaries and any businesses or business names under which it does business (the "Receivership Entities").

2

## The Receivership Entities

6.    Rex Venture Group, LLC is a Nevada limited liability company with its former principal place of business in Lexington, North Carolina. RVG wholly owns and operated ZeekRewards, an internet website (www.zeekrewards.com) with a physical location for operations in Lexington, North Carolina, and internet customers and contacts in this judicial district and throughout the United States and internationally. RVG also owns and operated Zeekler.com, an online auction business.

7.    Paul R. Burks was the owner and former top executive of RVG. He was the acknowledged leader of Zeek. Dawn Wright-Olivares was RVG's Chief Operating Officer and the Chief Marketing Officer of ZeekRewards. Together with Burks, Dawn Wright-Olivares developed the ZeekRewards scheme.

8.    Other key employees of RVG included Daniel ("Danny") Olivares, Dawn Wright-Olivares' stepson who was responsible for designing and running RVG's websites and databases with Burks; Alexandre ("Alex") de Brantes, Dawn Wright-Olivares' then-fiancée who had the title of Executive Director of Training and Support Services; Roger Plyler, who handled "affiliate relations"; and Darryle Douglas, who was a member of RVG's senior-level management.

9.    Burks, Dawn Wright-Olivares, Danny Olivares, de Brantes, Plyler and Douglas were the primary operators and insider beneficiaries of the ZeekRewards scheme. Collectively, these individuals may be referred to as RVG's "Insiders." The Insiders are not named defendants in this action; however, the Receiver has filed a

3

separate action against them in this Court asserting claims for breach of fiduciary duty, conversion, unjust enrichment, avoidance of fraudulent transfers and other relief.

10.     On or about December 20, 2013, the United States Attorney's Office for the Western District of North Carolina filed a Bill of Information (the "Information") against Dawn Wright-Olivares and Danny Olivares alleging that they, with others, engaged in an over $850 million Ponzi scheme through Zeekler and ZeekRewards.

11.     Dawn Wright-Olivares agreed to plead guilty to engaging in a securities fraud conspiracy and tax evasion as charged in the Information. Danny Olivares agreed to plead guilty to engaging in the same securities fraud conspiracy as charged in the Information.

## The Defendants

12.     Eric Mortensen is, upon information and belief, a resident of Kastrup, Copenhagen, Denmark. Mortensen is a former ZeekRewards "affiliate" and was a "net winner" of $563,452.84 under one or more usernames, including "mysecretcircle."

13.     Joergen Stegler Lorentzen is, upon information and belief, a resident of Vestervig, Thisted, Denmark. Lorentzen is a former ZeekRewards "affiliate" and was a "net winner" of $64,610.97 under one or more usernames, including "Thybo."

14.     Leda Rasmussen is, upon information and belief, a resident of Copenhagen, Denmark. Rasmussen is a former ZeekRewards "affiliate" and was a "net winner" of $53,652.76 under one or more usernames, including "bmw4me2."

4

## JURISDICTION, VENUE AND STANDING

15.     On August 17, 2012, the Securities and Exchange Commission filed the SEC Action in this District pursuant to Sections 20(b), 20(d)(1) and/or 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a)] and Sections 21(d)(1), 21(d)(3)(A), 21(e) and/or 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(l), 78u(d)(3)(A), 78u(e) & 78aa to halt the ZeekRewards Ponzi and pyramid scheme, freeze RVG's assets, and seek the appointment of a receiver for RVG.

16.     On the same date, in an Agreed Order Appointing Temporary Receiver and Freezing Assets of Defendant Rex Venture Group, LLC (the "Agreed Order"), this Court authorized and directed Mr. Bell as RVG's Receiver to institute actions and legal proceedings seeking the avoidance of fraudulent transfers, disgorgement of profits, imposition of constructive trusts and any other legal and equitable relief that the Receiver deems necessary and appropriate to preserve and recover RVG's assets for the benefit of the Receivership Estate.

17.     As an action brought by the Receiver in furtherance of his appointment and in the performance of his duties as directed by this Court, this action is within the ancillary jurisdiction of this Court.

18.      This action is also within the ancillary jurisdiction of this Court because this action concerns RVG's property and assets, which are now under this Court's exclusive jurisdiction.

Case 3:15-cv-00199-GCM   Document 1   Filed 05/04/15   Page 5 of 33

19.     This Court has subject matter jurisdiction over this matter pursuant to its common law ancillary jurisdiction as set forth above.

20.     Also, this Court has subject matter jurisdiction under 28 U.S.C. § 1367 because this action is directly related to the claims in the SEC Action, concerns property within this Court's exclusive control and/or is in furtherance of the duties given to the Receiver by this Court.

21.     Further, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2) as an action among citizens of a State and citizens or subjects of a foreign state for each of the defendants for whom the amount in controversy exceeds $75,000.

22.     This Court has personal jurisdiction over the Defendants pursuant to N.C. Gen. Stat. §1-75.4 because, *inter alia*, this action relates to money or other things of value sent from North Carolina to Defendants at their order or direction. By voluntarily participating in the ZeekRewards scheme and purposely directing actions towards North Carolina, including numerous communications with RVG and/or meetings in North Carolina, the Defendants created a substantial connection to North Carolina such that the exercise of personal jurisdiction over them is fair and just.

23.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial portion of the events and acts giving rise to this action, including the appointment of the Receiver, occurred in this District.

24.     The Receiver has standing to bring the claims made in this action pursuant to his authority and the direction of this Court and additionally has standing to bring the fraudulent transfer claims pursuant to N.C. Gen. Stat. § 39-23.7.

25.     Pursuant to the Agreed Order, the Receiver has obtained the permission of this Court to file this action.

## PONZI AND PYRAMID SCHEMES

26.     Legitimate business and investment opportunities are based on the expectation of a return from or portion of the profits of an actual business enterprise.

27.     In contrast, a Ponzi scheme is a fraudulent scheme in which returns to participants are not financed through the success of the underlying business venture. Instead, the money to pay returns comes from the payments made by other (usually later) participants in the scheme.

28.     Typically, participants are led to believe they will receive unrealistically high returns for their payments.  Then, money from the scheme is used to pay high returns to early participants in order to create the (false) appearance of profitability and attract new participants to perpetuate the scheme.

29.     The scheme inevitably collapses when the flow of money from new participants is insufficient to pay the expected returns to existing participants or the fraud is discovered.

30.     Thus, a Ponzi scheme is established, *inter alia*, by evidence that (1) participants put money into a company because they are led to believe that they will receive large returns for their payments, (2) initial participants are actually paid the high

7

returns, which attracts additional participants, (3) the underlying business venture, if any, is exaggerated and yields insufficient funds to pay for expenses and provide the expected returns to participants, and (4) the source of payments to earlier participants is cash infused by later participants.

31.    Other potential indications of a Ponzi scheme include, but are not limited to, the promise of large, unrealistic returns with little or no risk; the promise of consistent returns; false or non-existent books, records, financial statements and communications with the participants and the public; and the lack of transparency, secrecy, exclusivity and/or the complexity of the scheme.

32.    A pyramid scheme is a scheme in which a participant pays for the chance to receive compensation for recruiting new persons into the scheme as well as for when those new persons themselves recruit new participants.  In unlawful pyramid schemes, compensation rewards are not primarily paid based on the sale of products to ultimate users.

33.    An intent to defraud future participants can be inferred from the mere fact that a person or company is running a Ponzi and/or pyramid scheme.  Indeed, no other reasonable inference is possible.  A Ponzi and/or pyramid scheme cannot work forever. The investor pool is a limited resource and will eventually run dry.  The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors.  He or she must know all along, from the very nature of the activities, that

8

investors at the end of the line will lose their money. This knowledge that future investors will not be paid is sufficient to establish an actual intent to defraud them.

## **FACTS SUPPORTING THE RECEIVER'S CLAIMS**

*ZeekRewards and Zeekler's Operations*

34. Beginning at least as far back as 1997, Paul Burks operated a number of generally unsuccessful multi-level marketing businesses through Rex Venture Group, LLC (and related entities) with names such as Go-Go Hub, Free Store Club, My Bid Shack, New Net Mail and Signed and Numbered International.

35. In 2010, RVG launched Zeekler.com, a so-called "penny auction" website where items ranging from personal electronics to cash were auctioned to bidders.

36. A "penny auction" does not work like a typical auction. In a normal auction, it costs nothing to bid, and the auction price rises based on the amount of the bid until there is no higher bid or the amount of time set for the auction expires. In a "penny auction," bids must be *purchased* by bidders, and each incremental bid placed raises the amount of the total price of the auction item only by $0.01. Penny auctions have a timer, but unlike a typical auction, each new bid at the end of the timer resets the bid clock, usually for 30 seconds to a minute. The penny auction ends when the bid clock expires with no new bid. The winner then pays the auction price (plus the cost of bids used), which is theoretically well below the retail price. However, the unsuccessful bidders lose all the money they spent to purchase bids.

Case 3:15-cv-00199-GCM   Document 1   Filed 05/04/15   Page 9 of 33

37.     During 2010, the Zeekler penny auctions were not very successful. Indeed, Burks was forced to borrow money from Roger Plyler, then a business partner, to keep the business going.

38.     RVG's fortunes changed in 2011. In January 2011, RVG launched a new money-making scheme – ZeekRewards. RVG promoted ZeekRewards as Zeekler.com's "private, invitation-only affiliate advertising division." In reality, ZeekRewards was just a multi-level marketing scheme grafted onto the Zeekler business. It purported to pay a portion of the profits from the Zeekler penny auction business to participants who earned bid balances or points, primarily by buying auction bids. RVG told potential participants, "Zeekler tallies total sales and pays a percentage to all active ZeekRewards members." Also, participants in ZeekRewards, often called "Affiliates," were paid for recruiting other participants in a pyramid "multi-level" sales format.

39.     Bidders on the Zeekler penny auctions could purchase bids at retail for $0.65, or they could acquire bids as ZeekRewards affiliates (or as free samples from RVG or an affiliate). ZeekRewards affiliates paid $1 for what RVG referred to as "compounding," "sample" or "VIP" bids. The retail bids and the compounding / sample / VIP bids all had the same effect in the auctions – placing a bid raised the price of an auction item by one cent. However, bids bought through ZeekRewards rather than as retail bids were much more valuable because what were really being purchased were points that entitled Affiliates to a portion of the profits from the business. This was the real reason Affiliates paid $1 for auction bids they could buy for $.65.

10

40. As one Affiliate told Burks, "I know how the system works mathematically and you know I know. Whether you call the bids bids or hamburgers makes no difference. People are not joining Zeek to get hamburgers, or auction bids; they are joining Zeek to make money…."

41. ZeekRewards emphasized that the offer to pay Affiliates for purchasing compounding / sample / VIP "bids" distinguished those bids from the simple purchase of retail bids to participate in the Zeekler auctions. In the "About us" section of the ZeekRewards website, the company wrote: "PLEASE NOTE: To qualify for the 125% reward points you MUST buy the bids in the ZeekRewards back office. Bids purchased on the Zeekler Penny Auction site are 'retail customer' bids and do not qualify."

42. Further, ZeekRewards made clear that even though bids bought through ZeekRewards could be used in the auctions, that fact was irrelevant to the multi-level marketing scheme. Affiliates were told that using the bids in the auction would have no effect on their all-important bid or points balance ("Each time you buy a Compounding Bid in your ZeekRewards Back Office a bid is added to the Compounding bucket. *Spending the bid in an auction does not remove it from the bucket*.") (emphasis added).

43. Not surprisingly, even though a largely bogus "bid giveaway requirement" was added later in the scheme, relatively few ZeekRewards participants or "bid giveaway" recipients used their sample/VIP bids in the Zeekler auctions. Prior to shutdown, RVG estimated that only approximately 19 million VIP bids were used in auctions out of over 7 billion VIP bids created – less than 1/3 of 1%.

11

44.     From the beginning, RVG intended to use "bids" in ZeekRewards not as a product but as a proxy for money deposited into the program.  Dawn Wright-Olivares was very clear about the plan, telling Danny Olivares on January 21, 2011: "We're just going to use bids as currency."  On another occasion, Dawn Wright-Olivares referred to the compounding bids as "Monopoly money."

45.     Quickly, RVG's focus changed from Zeekler to ZeekRewards, which was the source of nearly all the company's income.  Relative to ZeekRewards, little or no money was made in the Zeekler "penny auction" business.

46.     The sale of compounding / sample / VIP bids in ZeekRewards dwarfed the sale of "retail" bids.  According to the ZeekRewards database, ZeekRewards sold approximately $820 million in compounding / sample / VIP bids, but only about $10 million in retail bids were sold.

47.     While over $400 million dollars was paid out to ZeekRewards Affiliates over the course of the scheme, the money used to fund ZeekRewards' distributions to Affiliates came almost entirely from new participants rather than income from the Zeekler penny auctions.  Only about $10 million dollars in retail bids were sold (of which $3.6 million reflected purchases by net losing Affiliates).  So, the "profit" from the penny auction business, if there was any at all, was too small to support even 3% of the total payments made to participants.

48.     Burks and the other Insiders were aware that the payouts to Affiliates would be funded by new participants rather than retail profits from the penny auctions.

12

Dawn Wright-Olivares excitedly told Burks early in the scheme, "I think we can blow this OUT together- we've already attracted a great many big fishes."

*ZeekRewards Compensation Plan*

49.     ZeekRewards succeeded because it promoted a lucrative "compensation plan," offering large amounts of passive income to entice individuals to participate in the scheme.

50.     The participants in the ZeekRewards scheme invested money in the scheme by buying so-called "bids/points," "memberships," "subscriptions," customer names, and other items related to the scheme.

51.     ZeekRewards was a common enterprise in that the participants relied on Burks and RVG to run the "penny auction" business, which was claimed to be the source of profits for the company.  The participants in ZeekRewards expected that they would receive profits from the Zeekler penny auction or other Zeek efforts.

52.     The compensation plan consisted primarily of two components: (1) the "Compounder," also known as the "Retail Profit Pool" or "RPP," which supposedly allowed participants to collectively share up to 50% of Zeek's net retail profits and receive a 125% return on investment; and (2) the "Matrix," which was a multi-level marketing commission program.

53.     Initially, ZeekRewards promised a 125% return on a passive investment, describing the program as follows: "What if you found a very simple and quick way to

13

earn 125% profit on the dollars you spend with us without ever having to sell a thing or recruit a soul?"

54.      In a pitch entitled "Latest Zeek Compounder News" on January 10, 2011, RVG wrote: "ZeekRewards is a new kind of loyalty program that gives a limited number of early adopters the opportunity to compound up to 125% of each bid purchased," and went on to say that there is "no recruiting, . . . your money [is] compounding for you daily."  Other recruiting emails claimed, "the minimal requirement is to simply place one free ad *somewhere* each day" and "if you do then the company will rebate you up to 125% of each bid purchased."  (emphasis in original email).

55.      Another pitch touted the income participants would receive: "I found something I believe is absolutely out of this world . . . it's called the 'Compounder' and "grows income for you by compounding it daily;" . . . "the new system [lets] you earn every 24 hours and can generate for you 4 or 5 figures or more per month . . . ." "[I]f you've ever wanted to earn 5 figures or more monthly, passively, then this is your chance."  Similarly, de Brantes boasted that by participating in ZeekRewards: "Many are currently receiving $2,000 to $3,000 per month PASSIVELY." (emphasis in original).

56.      Early ZeekRewards participants were told to expect profit shares of .5% to 4% *daily*.  The first day the Compounder share percentage was allocated to participants was January 20, 2011, and the share percentage was 3.24%.

57.      As the scheme progressed, participants continued to be told to expect large, consistent daily returns.  On May 14, 2011, Paul Burks told Michael VanLeeuwen

14

("Coach Van") that "our goal has always been 1% Mon-Thurs and 1/2% weekends, Fri-Sun. We have always maintained those averages and exceeded them often."

58. And, even after counsel advised against publicly promoting a 125% return, RVG continued to tell Affiliates and prospects to expect large returns. For example, de Brantes told an affiliate in July 2011:

> [O]ur average has been between 1.6–1.8% which would actually be a great deal more than 125%. The attorneys our [sic] advising us on what we can and can't say and now it's our job to figure out how much we need to pay daily to get everyone exactly what we intend to give (it makes it a little tricky but it is our intention to maintain a system that pays 125% without saying it anywhere on the site). It's my understanding that to reach 125% we'll need to pay 1.38% per day. Our programmers and strategists are working around the clock to land on the right method, percentages, and presentation for all of this. Right now we're still working on the 125% cap system. We just aren't saying 125%.

59. Therefore, Affiliates paid and invested money into ZeekRewards with the expectation that they would profit from their payments based on the success of the company's operations.

60. All the income received by ZeekRewards and Zeekler, regardless of source, was pooled and comingled in a cast of financial institutions that changed as the scheme evolved or as financial companies refused to work with RVG.

61. Although the specifics and the terminology of the ZeekRewards "Compensation Plan" changed from time to time as Burks and the other Insiders tried to prolong and prop up the scheme, the two pillars of the plan for most Affiliates were always: (1) "profit" sharing (first called the Compounder then later the Retail Profit Pool (or "RPP")) and (2) the multi-level marketing pyramid that paid Affiliates a

15

"commission" on the membership fees paid by recruited "downline" Affiliates (known as the Matrix).

*The Compounder a/k/a Retail Profit Pool*

62.     ZeekRewards' Affiliates' primary money making tool was the "Compounder."  To participate in the Compounder, Affiliates purchased "compounding" bids, which earned Affiliates one point for each "compounding" bid that they purchased from the company.

63.     To become an Affiliate "qualified" to receive points required little or no effort, despite the bogus claim that Affiliates "earned" points.  As discussed in more detail below, Affiliates were required to place daily one free digital ad (prepared by the company) for Zeekler.com.  Later, Affiliates were told they needed to "give away" the bids in order to obtain points, although in practice this so-called "requirement" was easily met: Affiliates could simply pay extra to have the company "give away" the bids for them.  This, in turn, was yet another revenue source for the company.

64.     As the inducement to purchase these "compounding" bids, ZeekRewards told Affiliates that the company would give a portion of the company's daily earnings or profits (often claimed to be 50%) to point-holding Affiliates.  The size of the daily "profit sharing" payment each affiliate received through the Compounder was based upon the number of points the affiliate held in his or her account.

65.     The size of each Affiliate's daily award depended only on the Affiliate's point total and was not based on the amount of services provided to ZeekRewards.  Thus,

16

regardless of the Affiliates' efforts, buying more points resulted in a larger profit share, just like having more shares of stock results in a larger dividend for a stockholder.

66.     ZeekRewards described the "Compounder" process as follows: "At the end of each business day (7days a week) the company determines its daily overall profitability and rebates a percentage back to its Active Advertising Affiliates based on each individual Premium Members Compounder Bid Balance."

67.     Each day, affiliates had a choice to be paid all or a portion of the so-called "profit" award in cash or to use the "cash" award to buy more bids/points, which then added to the bid / points balance and "compounded" as the daily percentage awards were made.

68.     Burks and the other insiders understood that the compensation plan would be unsustainable in both the short run and the long run because there would not be enough new participants to support full daily cash payments to a growing number of existing Affiliates.

69.     Prior to the shutdown of ZeekRewards, there were over 3 billion VIP bid points in the ZeekRewards system.  Based on the actual average daily "profit" percentage of 1.43% used during the scheme, the daily "profit" award to Affiliates would be over $40,000,000 on 3 billion points.  The amount of money paid in to ZeekRewards daily was far less than $40 million. Therefore, if RVG had been required to pay the daily awards supposedly available to Affiliates in cash, ZeekRewards would have quickly collapsed.

17

70.     Specifically, during the last month ZeekRewards operated (July 16, 2012 to August 15, 2012) the daily average RPP award was $38,237,036, but the daily receipts (from all sources, not just retail auctions) were much smaller, averaging approximately $8,850,000. Thus, not only were the ZeekRewards payouts made from the money put in by other participants, but the so-called "profit" awards greatly exceeded total receipts, which, of course, was unsustainable.

71.     So, to maintain the program for as long as possible and generate the most income, ZeekRewards actively discouraged Affiliates from requesting actual payment of all their profit awards in cash.  Instead, Affiliates were encouraged to let their balances "compound" and only take 20% or less of their "earnings."

72.     Dawn Wright-Olivares explained and promoted the plan in a Skype chat as follows:

> Here's a scenario here where you could be receiving $3,000 per month RESIDUALLY.  Let's use a 1% daily cash-back figure in this example (Please note: This is only an example and the actual amount will vary day to day).  When you reach 50,000 points in your account, then you could start doing an 80/20 cash-out plan.  Pay close attention?  When you hit 50,000 points in your account, if the daily cash-back percentage is 1%, ZeekRewards will be awarding you with $500.00 each day.  First of all, did you catch that? ... you're making $500 per day ... it's your money! Ok, the 80/20 plan works like this, take 80% of that $500 (or $400) and purchase more VIP bids to give away to new customers as samples to continue growing your points balance.  Then, keep doing what you've been doing every day, which primarily consists of giving free bids away as samples and placing one free ad per day for Zeekler.com's penny auctions and submitting into your ZeekRewards back office.  Then, pull out 20% of the $500 (or $100) and request a check weekly.  That's $700 per week, or about $3,000 per month in residual income!  And keep in mind, these amounts can continue to grow day after day and month after month.

18

73. ZeekRewards eventually changed the name of the Compounder to the "Retail Profit Pool," or "RPP." In addition, they changed the name of compounding bids to "VIP bids" or "sample bids." However, while the names changed, the essential nature of the "profit" sharing scheme remained the same.

74. In one email, when referring to compounding bids being renamed VIP bids, Wright-Olivares wrote, "wherever you see a (compounding) next to VIP – you will know that these terms are interchangeable," and she later wrote that "no change has been made in how they operate, qualify or earn."

75. Indeed, Wright-Olivares admitted that she thought the name changes were a joke. In a June 15, 2011 email to O.H. Brown, an RVG advisor whose company created marketing videos for ZeekRewards, about a company webinar script, she said: "you'll see where I started to say Retail Profit Pool (lol) instead of Compounder…. We're going to call compounding bids – VIP bids."

76. However, whether it was called the Compounder or the Retail Profit Pool, the program was a fraud because the payments had no relation to actual "retail" profits nor were they calculated from real receipts or expenses.

77. Instead, the alleged "profit percentage" was nothing more than a number made up by Burks or one of the other Insiders. Most days, Burks made up the number. As Danny Olivares explained to RVG's internet provider, "Paul [Burks] goes in nightly and opens up adm_displayCompunder3.asp and enters a decimal percentage." Sometimes, the number was made up by Dawn Wright-Olivares or Danny Olivares.

19

78. Rather than reflecting the typical variances that might be expected in a company's profits, the alleged profits paid in ZeekRewards were remarkably consistent, falling nearly always between 1% and 2% on Monday through Thursday and between .5% and 1% on the weekends, Friday through Sunday. The goal of this fake consistency was to project the appearance of a stable source of income to entice new participants and to encourage existing Affiliates to allow their bid balances to compound rather than request payment of their daily award in cash.

79. With RVG's knowledge, Affiliates regularly touted the consistent payments in their recruiting of new participants. For example, "Coach Van's" email footer said: "It has been going like clockwork for over 220 days, 7 days per week."…. "EVERYONE. . .GETS. . .PAID. . .FIRST. . .DAY!" . . . This works every time with just one minute per day! If you're not getting paid every single day for 1 minute of work, . . . [sic] why not?" . . . "100 percent of our active members are paid daily 100 percent of the time within their first 24 hours without any referrals."

80. The payouts were so consistent that when a mistake was made (such as when an extra decimal place was added to the "profit" percentage or the lower "weekend" percentage was used on a "weekday") Affiliates would immediately complain. For example, on August 3, 2012, de Brantes sent Danny Olivares a Skype message saying, the "Thursday [RPP] commission's % are running like a weekend commission % and everyone is going crazy." Olivares replies that, he is "working on it."

81.     And, the Insiders realized that not paying Affiliates, even once, was not an option if they wanted to keep the scheme going.  On May 20, 2012, there were problems with payments to affiliates.  Dawn Wright-Olivares texted Danny Olivares and instructed him to post an update letting affiliates know their payments would eventually be processed and commissions would be paid, telling him, "[t]he fastest way to get charge [sic] as a Ponzi scheme is for distributors to claim they are not getting paid."

82.     Burks deliberately evaded affiliate questions asking how the RPP was calculated.  In a Skype chat with an affiliate, he said: "[a] proprietary system is used to determine the amount of profit sharing that is done each day.  We do not divulge the details of how those numbers are determined.  Our stated target of minimum of 1% weekdays (Mon-Thur) and .5% weekends (Fri-Sun) has always been met and exceeded. It is clearly not directly tied to the number of auctions in a particular day.  It is the overall average that counts."

83.     Behind the scenes, the insiders were not even subtle about the fake earnings numbers.  Often, the company simply used the previous week's daily RPP percentages. For example, on one occasion, Danny Olivares sent a text message to multiple insiders stating, "Need a % for rpp when you can."  Dawn Wright-Olivares responded, "Do whatever was last Monday."  Or, from Paul Burks: "Hey Dan.  Sorry about last night. What percent did you use?"  Danny Olivares: "Same as last Friday.  0.009."

84.     On another occasion, Burks wrote in a Skype message to Olivares that the RPP would be ".0089 unless you have already grabbed last week[']s :)."

85. Sometimes, Burks even told Danny Olivares *in advance* what a day's profit number would be, such as on September 14, 2011, when in the early morning Burks told him "to start the RPP run shortly after 7p.m. using .00179 as the percentage" because Burks was not going to be able to run it himself.

86. Even if the Insiders had intended to calculate actual profits (which they plainly did not), RVG did not maintain financial records sufficient to allow Burks or anyone else to calculate a daily retail profit for the company.

*ZeekRewards' "Advertising" Requirement*

87. In an unsuccessful effort to avoid the obvious legal infirmity of Affiliates simply buying points in return for the expectation of a share of the profits (like a stock purchase), ZeekRewards told Affiliates that in order to supposedly "earn" their points, they were required to place a short, free digital ad each day on one of the many free classified websites available on the internet.

88. Affiliates were told to merely copy and paste free ads created by ZeekRewards into a free digital classified ad website. Affiliates then submitted the ad's internet link to ZeekRewards to verify that they had placed the ad. Placing more ads or better ads did not change an Affiliate's share of the profits in any way.

89. And, the ad "requirement" was not imposed on all Affiliates. Burks even wrote a computer program that allowed a number of Affiliates who managed multiple accounts to avoid placing the ads altogether. As Burks wrote in an email to Danny Olivares on January 23, 2011, "This allows us to defer to some of our major people like

22

Agnita Solomon who manage dozens of accounts so that they don'e [sic] have to place so many ads every day."

90.     The ad process was intended to be very simple and was widely advertised as taking only 3-5 minutes each day.  For example, Burks routinely told Affiliates: "Placing an ad takes three to five minutes a day and can be done from anywhere there is an Internet connection."

91.     Indeed, because of how minimal the task was, Burks was irritated by Affiliates who complained when they were not paid:  "I am afraid I don't have a lot of patience anymore for people who are making hundreds of dollars a day for placing an ad and they get mad when their card declines and they miss a day.  Tough luck."

92.     The company did not believe that these digital ads made any material difference in the success of the Zeekler auctions and did no research to determine if the ads were successful.

93.     In reality, the ads were just an attempt to manufacture a cover for what was nothing more than the investment of money by Affiliates with the expectation of receiving daily "profit" distributions.

*ZeekRewards' Bid "Give Away" Requirement*

94.     In a further effort to justify the Affiliates' investments of money, beginning in August 2011, ZeekRewards purportedly required Affiliates to "give away" their purchased VIP bids to earn points.  The claimed intent of this "requirement" was to promote use of the auctions by new retail customers who received these free bids.

23

95.     However, Burks and the insiders knew that in practice the bid "give away" program (like the free ads) had no material impact on the success of the penny auctions.

96.     First, the company made little or no attempt to determine if bids had in fact been given to legitimate prospective retail customers.  Many Affiliates simply listed fake email addresses, addresses of other existing Affiliates or those planning to be affiliates, family members, and other non-productive locations for where the bids had been given away.  In some cases, the company just agreed not to require the affiliate to give away their bids to earn points.

97.     Also, both as a way to minimize any real effort by Affiliates and a way to make more money, Affiliates were given the opportunity to pay to have the company (supposedly) give the bids away on behalf of the affiliate.  Points were earned when the bids were given to the company (supposedly) to be given away.

98.     In fact, the company did not find prospective retail customers to whom it could give away all the bids, so millions of bids remained in the company unused.  But, ZeekRewards did make an additional $2.00 - $2.50 per customer "sold" to Affiliates.  And, because there were alleged limits on the number of bids that could be given away to any one person based on the Affiliate's membership level, tying the "give away" of bids to the accrual of points drove "upgrades" in membership levels which increased revenues even more.

99.     Danny Olivares explained the process of how VIP bids were automatically given away to accrue points for Affiliates as follows: After a VIP bid is purchased, the

24

"Company pool automates the process of giving bids away as samples. Giving the bids away as samples is what generates VIP points. Which the rpp uses to calculate your award. So we come full circle."

100.    Burks told Affiliates that the company-wide Bid Pool would "take ALL of the sting out of the whole bid-give requirement! . . . [Y]ou will be able to automatically give your bids each day" and "you will automatically receive the VIP points as soon as you receive your daily RPP award each day. . . . All you'll have to do is select the "Give my bids to the Zeek bid pool" option and the system will automatically give your bids to your customers and every customer that registers @ Zeekler.com that wants free bids! If you do not have any customers then you simply purchase them as you need them from the customer co-op, and that will be automated as well!"

101.    Later, Affiliates were not allowed to simply pay the company to "give away" the bids for them, but they were allowed to pay third parties to do so. ZeekRewards made no effort to determine if these bids were in fact given to legitimate potential retail customers.

*The Matrix*

102.    The second broad component of the ZeekRewards compensation plan was paying Affiliates to recruit other Affiliates in a pyramid-style payment system. ZeekRewards referred to this system as the "Matrix."

103.    The Matrix pyramid was initially a "2x21" matrix in which Affiliates made multi-level marketing commissions for 21 levels down in their "organization." Later,

ZeekRewards used a "2x5 forced-fill matrix," which is a pyramid with 63 positions that paid a bonus to Affiliates for every "downline" investor within each affiliate's personal matrix, plus a "matching bonus" for every 5th level where certain qualifiers were met, so in effect the commissions could be earned indefinitely.

104.    To get bonuses through the Matrix, Affiliates just had to (1) enroll in a monthly subscription plan requiring payments of $10, $50, or $99 per month; and (2) recruit at least two other "Preferred Customers" (i.e., investors who also enrolled in a monthly subscription plan).

105.    Once qualified, affiliates earned bonuses and commissions for every paid subscription within their "downline" pyramid, whether or not they personally recruited everyone within the matrix.  Simply put, Affiliates were rewarded merely for recruiting new investors without regard to any efforts by the Affiliates to sell bids or products or otherwise materially support the Zeekler retail business.

106.    The funds raised through the Matrix were commingled with the money raised through the Compounder / Retail Profit Pool (and what little money came in from the retail auction business), so nearly all the money used to pay the pyramid commissions came from other investors in the scheme.

107.    While some commissions were available to Affiliates on customers' purchases of retail bids for use in the Zeekler auctions, Affiliates did not need to sell retail bids to customers in order to receive commissions through the Matrix. Furthermore, overall commissions from the sale of retail bids to end-user customers were

26

miniscule.  These retail commissions, referred to by RVG as "Zap Commissions," were merely incidental to the overall commissions earned through the Matrix for downline subscription payments and through the Compounder/RPP.

108.    As with the Compounder, the Insiders changed the terminology for the Matrix, but they never changed the real essence of the scheme.  Dawn Wright-Olivares explained the cosmetic changes to the Matrix this way: "you [will] in effect be paid on levels 5-10".... "but we can't SAY that.  Deep matrices get shut down.  So instead...we say that you are getting a matching bonus on all of the 2x5's on your 5th level. It's semantics, but semantics mean a great deal with regulators." …  "[I] don't really understand how they can say they have levels 10, 15, etc. when it's a 2x5, but if we can get away with it this way - then it's my vote to leave it alone."

109.    Similarly, Keith Laggos, a ZeekRewards advisor, emailed Dawn Wright-Olivares (copying Burks) in July 2011: "when talking about matching bonuses, you are showing being paid on 1 to 10, 1 to 15 and 1 to 20 levels.  This defeats what we did by going to a 2x5 matrix.  You should say a 100% matching on all your 5th, 15th and 20th level affiliates' 2 x 5 matrixes.  I know you want to show they get paid on 20 levels in a 2 by 20 matrix, but that is when you can get a pyramid investigation or charge."

*The "Sweet 16"*

110.    In addition to the Compounder/RPP and the Matrix, a select group of individuals was allowed an additional revenue source, referred to as the "Sweet 16."

27

111. The Sweet 16 was another means by which RVG made payments on a passive investment. It did not involve the sale of a product, nor did it require a member to recruit other participants into the program.

112. As RVG advertised in late 2010 or early 2011, the Sweet 16 was a program where participants received "a 1/16 share at the diamond level" on paid subscriptions in the then-2x21 matrix "across the entire width of the matrix."

113. Participation in the Sweet 16 cost a one-time fee of $999.

114. Each month, RVG totaled commissions from all diamond subscription renewals for the entire Matrix and divided a portion of those commissions among the Sweet 16 members.

115. On information and belief, Sweet 16 payments to investors totaled more than $4.7 million over the life of the scheme.

*The "Row of 16"*

116. In addition to the Sweet 16, two insiders were allowed payments through a revenue source referred to as the "Row of 16."

117. Dawn Wright-Olivares and Danny Olivares were the only two members of the Row of 16.

118. These Row of 16 payments were generally calculated as sixteen times the highest Sweet 16 payment amount.

119. The Row of 16 was nothing more than a gift or bonus to these two individuals.

28

120.    As with the other "compensation" payments made to Affiliates, these payments were made with money received from Affiliates purchasing VIP bids or subscription renewals, not from a legitimate retail activity.

121.    Dawn Wright-Olivares and Daniel Olivares received more than $5.8 million in Row of 16 payments over the life of the scheme.

*The Insiders' Efforts to Avoid Discovery of*
*the ZeekRewards Ponzi and Pyramid Scheme*

122.    RVG's insiders often worried about being caught and sought to make the unlawful scheme seem legitimate in many ways.

123.    As described above, the changing of terminology or the rules of the game, but not the substance of the scheme, was a common practice. Throughout 2011 and 2012, Burks and the Insiders regularly changed the names of the program elements or demanded that Affiliates stop using certain words, which accurately described the scheme but highlighted its illegality.

124.    For example, on July 26, 2011, de Brantes emailed an Affiliate with a list of things the Affiliate can and cannot say, including: "compounder, compound, compounded, compounding, 125%, Members, Interest, Investment, Mature."  On the list of sanitized things the Affiliate could say: "You make a purchase and re-purchase; You earn bids; The bids retire on a 90 day timeline averaging 1.5% a day; You get cash rewards; Retail Profit Pool; Everyone is an Affiliate and they own business center subscriptions; Your Bid balance can increase as oppose to mature."

29

125. Also, RVG employees openly discussed the words that could and could not be said, even adding a bit of black humor as the scheme headed towards its inevitable demise. On June 8, 2012, de Brantes and others discussed "training" Affiliates on "the top 10 or 12 words that every Affiliate should erase from their vocabulary". The list included "investment, put money in, roi [return on investment], fund, passive income, passive returns, returns and points are not dollars." In response to this list, Ken Kilby (a supposed "compliance officer") suggested adding: "BBB, Attorney General, FBI, FTC, Report, turn you in."

126. Beyond the shifting terminology, Burks and the Insiders tried to bolster the perception of the legitimacy of the scheme by running "Compliance" courses for Affiliates. As with the advertising or bid give-away "requirements," the "compliance" courses were just an effort to obscure the fraud and wrap it in a cloak of propriety, while making even more money in the process.

## FIRST CLAIM FOR RELIEF

### Fraudulent Transfer of RVG Funds in Violation of the North Carolina Uniform Fraudulent Transfer Act

127. The Receiver realleges and incorporates by reference the foregoing paragraphs.

128. In the course of operating the ZeekRewards scheme, Burks and others – through RVG – made numerous "profit payments," "commission" payments, bonuses and other payments to the Defendants as described above in excess of the amount of money paid by these Defendants to RVG. These excess payments are collectively referred to as the "Transfers."

30

129. The Transfers were made within four years before the date of this action.

130. Each of the Transfers constitutes a "transfer" of an asset or an interest in an asset within the meaning of N.C. Gen. Stat. §39-23.1(12).

131. All of the Transfers occurred during the course of a Ponzi and/or pyramid scheme, when participant money was commingled and the Receivership Entities were effectively insolvent.

132. Each of the Transfers was to, or for the benefit of, one or more of the Defendants.

133. Each of the Transfers was made with money misappropriated from one or more of the Receivership Entities. At all times relevant herein, the Receivership Entities had a claim to the funds used for the Transfers.

134. Each of the Transfers was made without receipt of reasonably equivalent value from the Defendants.

135. Each of the Transfers was made by Burks and others to further the Ponzi and/or pyramid scheme and was made with the actual intent to hinder, delay or defraud some or all of the Receivership Entities' then existing creditors.

136. In the alternative, at the time of each of the Transfers, the Receivership Entities were insolvent or became insolvent as a result of the Transfer; were engaged in a business or transaction, or were about to engage in a business or transaction, for which the remaining assets of the Receivership Entities were unreasonably small in relation to

the business or transaction; or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts became due.

137.  The Transfers constitute fraudulent transfers avoidable by the Receiver pursuant to N.C. Gen. Stat. §39-23.4(a)(1), N.C. Gen. Stat. §39-23.4(a)(2) or N.C. Gen. Stat. §39-23.5 and recoverable from the Defendants pursuant to N.C. Gen. Stat. §39-23.7 and N.C. Gen. Stat. §39-23.8.

138.  Pursuant to N.C. Gen. Stat. §39-23.4(a)(1), N.C. Gen. Stat. §39-23.7, N.C. Gen. Stat. §39-23.8 and 28 U.S.C. §2201, the Receiver is entitled to a Judgment: (1) avoiding the Transfers; and (2) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

## SECOND CLAIM FOR RELIEF
### Constructive Trust

139.  The Receiver realleges and incorporates by reference the foregoing paragraphs.

140.  As alleged above, the assets of the Receivership Entities have been wrongfully diverted as a result of fraudulent transfers to the Defendants for their individual interests and enrichment.

141.  The Receiver has no adequate remedy at law.

142.  Because of the fraudulent transfers, the Receiver is entitled to the imposition of a constructive trust with respect to any transfer of funds, assets, or property from the Receivership Entities, as well as any assets received by Defendants in the past or on a going forward basis as a result of those transfers from the Receivership Entities.

32

143.    The Receiver is entitled to and demands title, possession, use and enjoyment of the foregoing property for the benefit of the Receivership Estate.

## **PRAYER FOR RELIEF**

WHEREFORE, the Receiver respectfully requests that the Court:

1.    Enter Judgment against each of the Defendants in the amount of their net winnings from the ZeekRewards scheme.

2.    Enter an injunction against the Defendants prohibiting each of them from dissipating their assets pending satisfaction of the Judgment against them.

3.    Award prejudgment and post-judgment interest, costs and such other and further relief against all Defendants as the Receiver is entitled to recover.


Dated:  May 4, 2015                     Respectfully submitted,


                                        /s/ Irving M. Brenner
                                        Kenneth D. Bell, Esq., Receiver
                                        Irving M. Brenner (NC Bar No. 15483)
                                        Matthew E. Orso (NC Bar No. 42409)
                                        McGuireWoods LLP
                                        201 North Tryon Street, Suite 3000
                                        Charlotte, North Carolina 28202
                                        (704) 373-4620
                                        (704) 373-8836 (fax)
                                        kbell@mcguirewoods.com
                                        ibrenner@mcguirewoods.com
                                        morso@mcguirewoods.com

33